DANIEL B. SHELTON *vs.* CITY OF SHELTON ET ALS.

Third Judicial District, New Haven, January Term, 1930.

WHEELER, C. J., MALTBIE, HAINES, HINMAN and BANKS, Js.

Argued January 21st—decided June 2d, 1930.

*William F. Healey,* with whom, on the brief, was *Patrick B. O'Sullivan,* for the plaintiff.

*Joseph G. Shapiro,* with whom was *Harry Alliston Goldstein,* and, on the brief, *Charles S. Brody,* for the defendant.

WHEELER, C. J.   Milk is in universal use as a food. It is peculiarly liable to contamination and adultera-

tion. Therefore in the interest of public health and safety the regulation of its production, marketing and sale are held to be within the proper exercise of the police power of the State. This the State may effectuate directly by its statute, or it may delegate its regulatory power to an official board or officer, or to a municipality. It may exercise this power directly and completely, or it may delegate it directly or completely to either of these agencies, or it may act in the exercise of this regulatory power in concurrence with the municipality. The State may determine the standard of quality, prohibit the production, sale or distribution of milk not within the standard, divide it into classes, and regulate the manner of their use, so long as these standards, classes and regulatory provisions be neither unreasonable nor oppressive. The many recorded instances in which the courts have sustained this power of regulation bear witness to the liberality of their viewpoint where the public health and safety are concerned. If there be room for a reasonable difference of view as to the legislative prohibition, classification or regulatory provisions, courts will accept the legislative determination and not impose their own will.

It must be conceded that the General Assembly has by granting in § 66 of the defendant's charter the right to it "to license milk dealers and regulate the sale and manner of distribution of milk and to prohibit the sale thereof," delegated to it a certain measure of its police power. Neither can it be denied that in many statutes the General Assembly has exercised its power of regulation of the production, sale and distribution of milk.

We have in the case before us an instance where the police power is to be exercised, concurrently, by the State in major part and by the municipality in minor part.

The single question which must be decided upon this

reservation is whether the city of Shelton possessed the power to enact this ordinance which in effect provides that no milk or cream shall be sold by retail dealers in the city of Shelton unless it is produced from tuberculin-tested cows or pasteurized. The power of the city to enact this ordinance depends primarily upon whether it is in conflict with, or inconsistent with, the statutes of the State relative to the regulation of the production and sale of milk and cream—unless there has been an express grant of power to it or the matter be one of purely local and municipal concern which the Constitution has committed to the city. The enactment of this ordinance by this city does not fall within these exceptions. This general rule of law has long been our accepted doctrine, certainly since *Southport* v. *Ogden,* 23 Conn. 128. If the general law be enacted after the ordinance covering the same field it will take the place of the ordinance and supersede it. If the ordinance be enacted after the general law in conflict with it the ordinance will be void. *State* v. *Stokes,* 91 Conn. 67, 70, 98 Atl. 294. In *State* v. *Tyrrell,* 73 Conn. 407, 408, 47 Atl. 686, we held that an ordinance, which purported to prevent the sale and consumption of impure and adulterated milk within the city limits when the same subject-matter was fully covered by the General Statutes, would be void. Where the statute and ordinance deal with the same subject-matter, the statutory power will prevail, to the exclusion of the ordinance, so far as they conflict. *State* v. *Welch,* 36 Conn. 215, 217. The danger from according to the State and the municipality concurrent power over police regulation of matters of public concern is emphasized in *Connecticut Co.* v. *New Haven,* 103 Conn. 197, 211, 130 Atl. 169, and *Central Railway & Electric Co.'s Appeal,* 67 Conn. 197, 217, 35 Atl. 32, and the supremacy of the enactment of the State over the mu-

nicipal ordinance upheld. Ordinances, subject to the exceptions noted, must not conflict with the statutes and must be in harmony with the general law of the State and with its public policy as expressed in its legislation and its law. 2 McQuillin on Municipal Corporations (2d Ed.) §§ 683, 685; *Schneiderman* v. *Sesanstein,* 121 Ohio St. 80, 167 N. E. 158; note to this case, 64 A. L. R. 993; note to *Korth* v. *Portland,* 58 A. L. R. 672 (123 Ore. 180, 261 Pac. 895); note to *State* v. *Fairmont Creamery Co.,* 42 A. L. R. 556 (162 Minn. 146, 202 N. W. 714); *Ex parte Daniels,* 183 Cal. 636, 192 Pac. 442; note to this case, 21 A. L. R. 1186.

Milk or cream coming from tuberculin-tested cows is one of the kinds of milk or cream which under the statute can be sold or offered for sale, but only when raw milk so sold or offered for sale as tuberculin-tested milk or cream shall be produced from cows officially tested by the commissioner on domestic animals. There is, however, no compulsion upon the retailer to sell milk or cream which has been tuberculin-tested. Milk or cream of a specified bacteria content may be pasteurized and sold under a special permit issued by the dairy and food commissioner. It is optional with the retailer whether he sell pasteurized milk or not. Our statutes as they existed when this ordinance was enacted must be examined in some detail in order to determine whether the ordinance does conflict, or is inconsistent, with them.

General Statutes, § 2482, as amended by Chapter 157 of the Public Acts of 1927, prohibits, under penalty, the sale for human consumption by any person of any milk containing an average of more than one million bacteria per cubic centimeter. The title of the Act of 1927, as well as that of this section, characterize such milk as "impure," as did the title of the amendment of

1925. The section of the General Statutes gave this content as the definition of "impure milk."

Section 2481, as amended by Chapter 231 of the Public Acts of 1925, prohibited, under penalty, the sale of any milk or product from milk from a cow emaciated from unknown causes, or which shows physical symptoms of disease which may be reasonably suspected to affect such milk. Section 2465, as amended by Chapter 143 of the Public Acts of 1923, provides that any milk sold or offered for sale shall be deemed to be sold or offered for sale "as of standard quality" unless otherwise expressly stated at the time. This section defines "milk of standard quality" as having the content therein specified. In § 2468, "cream of standard quality" is defined as containing a specified content, and § 2469 prohibits the sale or offer for sale as "cream of standard quality" cream which is not that, or any cream which has been adulterated.

Section 2473 penalizes the violation of these sections. Section 2485, as amended by Chapter 167 of the Public Acts of 1923, creates a milk regulation board, and § 2486 gives this board power to make, amend, repeal or suspend rules and regulations concerning the inspection of dairies, the production, care, handling, marketing or sale of milk and cream "to protect the public from the use of milk or cream which is unsanitary or detrimental to public health," and § 2492 penalizes anyone who violates these regulations.

Section 2504, as amended by Chapter 132 of the Public Acts of 1929, authorizes the appointment of a dairy and food commissioner and vests in him power to examine premises in which dairy stock is kept in which any unsanitary condition liable to affect the dairy exists, or is reported, or suspected to exist and gives him power to abate such condition. He may also prohibit the sale of any milk or milk products pro-

duced on any farm or dairy the owner of which shall fail to obey the order of the commissioner or his deputy to remove such unsanitary condition until it is abated to his satisfaction. Any person who refuses access to his premises by the commissioner, or sells contrary to such prohibition is subject to a penalty. The commissioner is authorized to appoint assistants to enforce the provisions of this statute as to the production and marketing of milk or cream and cause the prosecution for all such violations.

Other sections prohibit the sale of evaporated milk or cream, or skimmed milk, unless specified conditions designed to protect the purchasing public are complied with and prohibit the sale of filled milk; they specify as to the uses of cans, jars, bottles and containers used to hold milk for the purpose of preventing impurities getting in the milk and cream.

Chapter 225 of the Public Acts of 1925, supplements the then-existing statutory provisions as to the production and marketing of milk and cream: Producers are required to register with the dairy and food commissioner giving the location of premises on which milk is produced, the number of cows and the locality where the milk is to be sold and are prohibited from selling or distributing milk until so registered. Persons having a communicable or infectious disease or who shall care for any such person are prohibited at such time from handling milk or milk utensils. Places where milk is produced, handled or sold shall be open to inspection by the dairy and food commissioner at all reasonable times. Premises where milk, cream, skim milk or buttermilk is being produced, handled or sold shall be maintained in a clean and orderly manner. Cows shall be healthy and free from disease as determined by physical examination, kept clean, housed in suitable quarters, well lighted and ventilated. The

water used where the milk is produced or handled shall be free from pollution and organisms liable to cause disease. Nuisances shall not be located so as to be liable to be a menace to dairy products or public health. All utensils and containers shall be thoroughly washed and sterilized after use in handling milk. Special provision is made as to the floor, window space and screening of the milk house or room which is to be exclusively used for the cooling, handling and storing of milk. Milk to be immediately delivered subject to approval of the dairy and food commissioner shall not be required to be cooled. If not so delivered it shall be cooled to 55° F. in one hour after milking and the temperature maintained at not exceeding 60°.

The stipulated facts state that the plaintiff has complied with the laws of the State and the rules and regulations of the milk regulation board and the ordinances of the city of Shelton referring to the production, handling and sale of milk and cream, except the ordinance in question. We are thus at liberty to refer to the rules and regulations of this board which are matters of public record and in general use although not specifically made a part of the reserved facts, including the specifications for certified milk or cream and Grade A pasteurized milk or cream.

Under § 13 of Chapter 225 of the Public Acts of 1925, "no person . . . shall . . . advertise milk or cream as coming from tuberculin-tested cows or herds unless all raw milk sold or offered for sale by such person . . . shall be produced from tuberculin-tested cows or herds officially tested by the commissioner on domestic animals, or unless such person . . . shall have an accredited herd certificate issued within twelve months."

Section 14 of this Chapter provides that "no milk or cream shall be sold or advertised under any special

name, other than the name of the farm . . . or an indication of the tuberculin test, unless such milk or cream . . . shall have been produced according to the specifications for grades established by the . . . milk regulation board." Milk or cream coming from tuberculin-tested cows is one of the kinds of milk or cream which is permitted to be sold or offered for sale but only when the raw milk so sold or offered for sale as tuberculin-tested milk shall be produced in the manner specified in §§ 13 and 14. The production or sale of such milk by the producer or the sale by the retailer is permissive. There is no compulsion upon either to sell milk or cream which has been tuberculin-tested.

Section 2470 provides that no person shall sell or offer for sale any milk or cream which has been "Pasteurized" unless the receptacle in which it is contained is plainly labelled "Pasteurized." Section 16 of Chapter 225 of the Public Acts of 1925, as amended by § 3 of Chapter 232 of the Public Acts of 1927, prohibits a person from engaging in the process of "Pasteurization of milk or cream" until a permit has been issued to him by the dairy and food commissioner and provides that no milk or cream shall be sold in the State as "Pasteurized" milk or cream unless produced in accordance with the provisions specified in the Act. Then follow twenty-three sections prescribing with minuteness the regulations required in the process of pasteurization. It is optional whether a person shall engage in this process or shall sell pasteurized milk. The statute does not compel him to do either.

The milk regulation board, on June 1st, 1924, prescribed specifications for Grade A milk or cream and provided that no milk or cream shall be sold in the State as "Grade A" milk or cream unless such milk or cream has been produced according to the specifications by the milk regulation board. Then follow eight sec-

tions of specifications including the provision that, "The herd shall be free from tuberculosis, as determined by the official tuberculin tests and retests made as approved by the commissioner on domestic animals." The production and sale of this kind of milk or cream is optional with the producer.

On April 1st, 1927, the milk board adopted specifications for "certified milk or cream," one of which was that, "No milk or cream shall be sold in this State as 'certified' milk or cream unless such milk or cream has been produced according to the specifications" by the milk board. Then follow seventeen sections regulating the production and sale of this kind of milk, one of which was the requirement of the tuberculin test as prescribed for the "Grade A" milk or cream. The production and sale of this kind of milk or cream is optional with the producer. All that the statutes and the board require is that milk, whether pasteurized, tuberculin-tested, Grade A milk or cream, or certified milk or cream, shall be produced and sold in compliance with the statutes and with the regulations of the milk board. Under the provisions of the statutes, whether those existing in the Revision of 1918, or those as amended by the Acts of 1925 and 1927, raw milk could be produced and sold provided it had been produced and was sold in conformity with the then statutory requirements. Milk must not be adulterated. It must not come from a diseased cow or one suspected of so being. It must not be impure milk and it must not contain more than one million bacteria per cubic centimeter and it must be of the statutory content. It must not be unsanitary or detrimental to public health. It must have been produced and sold in compliance with all statutory regulations and with all regulations of the milk board.

All of these many and drastic regulations have one

common purpose, to preserve the public health of the people of the State by preventing the sale to them of milk or cream which does not conform to what the legislature deemed to be pure milk or cream and suitable for human consumption, and milk which is detrimental to public health. In large part these regulations are particularly applicable to the production and sale of raw milk; the other kinds of milk permitted to be produced and sold have in great measure their own applicable regulations. If the other statutes and regulations do not apply to raw milk there was no occasion for most of them. We take judicial notice of the fact that the production and sale of raw milk which complies with these statutes and regulations and those of the milk board are general throughout, at least, the greater part of the State.

The city of Shelton invokes the power accorded it by § 66 of its charter and § 2491 of the General Statutes, repealed by and re-enacted as § 1 of Chapter 272 of the Public Acts of 1929, which provides: "No provisions of sections 2485 to 2492, inclusive, . . . shall affect the authority of any town, city or borough to enact ordinances or by-laws for the control, regulation, sale or distribution, within its limits, of milk which is detrimental to public health." The sections referred to concern the regulations and prohibitions of the milk regulation board designed "to protect the public from the use of milk or cream which is unsanitary or detrimental to public health," and the prohibition of the dairy and food commissioner and his deputy of the sale of milk or other dairy product which is unsanitary and detrimental to health, and has not been produced, cared for, or handled in the manner prescribed by these sections and by the rules and regulations of the milk regulation board.

Obviously there is nothing in § 2491 or in § 1 of

Chapter 272 of the Public Acts of 1929 which gives the city of Shelton the right to prohibit the sale of milk or cream unless it be produced from tuberculin-tested cows or pasteurized. There is nothing in the section which grants to this city the right to prohibit the sale of raw milk which meets the statutory qualifications, by a producer or dealer who has complied with every provision of the law. Moreover, these sections limit the power of the city to the passage of ordinances "for the control, regulation, sale or distribution within its limits, of milk which is detrimental to public health," and which are not in conflict with the statutes.

The stipulated facts affirmatively state that the milk produced by the plaintiff is not detrimental to the public health and has been periodically analyzed and found to be clean and pure.

Milk which complies with all of the statutory requirements could not be found by the milk board or the dairy commissioner to be detrimental to the public health. Neither under § 2491, repealed by and re-enacted in § 1 of Chapter 272 of the Public Acts of 1929, nor under the power granted the city under § 66 of its charter (Special Laws of 1915), "to license milk dealers and regulate the sale and manner of distribution of milk and to prohibit the sale thereof," can a grant of power be found to enact this ordinance which takes from the producer and dealer the power to sell and from the people the power to buy, within the limits of this city, raw milk or cream not detrimental to public health, analyzed and found clean and pure, and produced and marketed in compliance with every statutory provision. The ordinance converts the permissive use of tuberculin-tested milk or pasteurized milk of the statute into a compulsory use. It prohibits absolutely the sale, and hence the use, of raw milk, whose use and sale the statute grants conditioned

upon compliance with the statutory requirements. The ordinance repeals this statutory grant within the limits of this city. The passage of this ordinance was beyond the powers granted this city.

The statutes as amended have covered the field of milk legislation, at least so far as the General Assembly purposed, up to the time of the passage of this ordinance. The subject-matter is not an exclusively local condition. To the extent the State legislation has gone it has preëmpted the field. The defendant under its general grant in § 66 can aid the purposes of this legislation. It cannot override it. It cannot prohibit what the statute grants. It cannot set up new standards in place of the legislative standards. It cannot substitute its judgment for the legislative judgment. It cannot overturn a public policy evidenced in long-continued legislation over a subject statewide in its range and not only intended to conserve the health of people but certainly doing it.

This is not the case of the ordinance speaking where the statute is silent. It is the case of a direct conflict between statutes and ordinance. They are irreconcilably inconsistent with one another. The ordinance must yield.

The statute law recognizes at least five kinds of milk and makes all five lawful provided the statutory provisions are complied with in their production and sale, viz: raw milk, tuberculin-tested milk, pasteurized milk, Grade A milk, and certified milk. The city of Shelton was without power to enact an ordinance prohibiting the sale at retail of any one of these kinds of milk which are authorized by statute. Whether the city could in the exercise of its police power add to these regulatory provisions we have no need to inquire. The cases we have cited from our own decisions fully support the conclusion we have reached. The

precise question before us was ruled upon adversely to the contention of the defendant in *State ex rel. Knese* v. *Kinsey,* 314 Mo. 80, 282 S. W. 437. The city of St. Louis adopted an ordinance prohibiting the sale of milk or cream within the city of St. Louis except pasteurized or certified milk. The statutes of the State authorized the sale of raw milk of a standard quality in accordance with the statutes of the State. The court held: "A city has ample power by police regulation to protect the health of its inhabitants, but a municipal police regulation cannot infringe on rights guaranteed by the Constitution or laws of the State. A municipality cannot lawfully forbid what the legislature has expressly authorized. . . . Therefore, it has no power to declare a food unwholesome which is, in fact, wholesome. When the State has enacted a law of general character and of statewide application, a city ordinance in conflict with the law is invalid. . . . It is apparent that the *statute* has made several classes of milk products, of which raw milk is one and pasteurized milk another. The ordinance under consideration forbids anyone to deal in raw milk, a product which the legislature authorizes as a lawful product and which admittedly is healthful and harmless. . . . Therefore, under the rule of law as stated above, on the face of the ordinance and the statutes, the city had no authority to forbid the dealing in raw milk and could not lawfully refuse permits to milkmen to sell it. . . . Here is a lawful product, made so by the statute of the State, and the ordinance purports to forbid a citizen his constitutional right to deal in that lawful and harmless product. This does not mean that the city may not make regulations which the statute does not impose, conditions which insure the purity of the product. The city may require standards of *quality*

in the milk dealt in, where the statute makes none."
See also *State* v. *Welch,* 36 Conn. 215, 217.

We are not now passing upon the merit or the reasonableness of the tuberculin-test, or of pasteurization. Primarily, these are for legislative, not judicial, consideration.

We do not pass upon the plaintiff's claim that the ordinance is void because uncertain and vague, nor upon his claim that it is unconstitutional because its requirements constitute class and discriminatory legislation for the reason that our answer to question a, disposes of the case.

We answer question a, that the ordinance does conflict with the statutes of the State and is for that reason void.

In this opinion HINMAN and BANKS, Js., concurred.

MALTBIE, J. (dissenting). Among the numerous statutes cited in the foregoing opinion, those which provide that milk and cream sold under a certain designation shall have certain qualities or be prepared in a certain way are not germane to the issue before us. They neither give nor withhold the right to sell milk but only make provision by which a purchaser may be assured of the quality of the milk he buys under a certain designation. Of the other statutes cited those concerning the sale of milk from diseased cows, fixing a bacterial content which may not be exceeded, and giving the dairy and food commissioner power to inspect dairies and make orders as to unsanitary conditions have existed in their essential provisions for a considerable time, the latest since 1911, and they could in themselves afford no ground to claim that the State had preempted the field of milk regulation. Particularly is this made clear by the fact that these laws all

were in existence when the statute establishing the milk- regulation board was enacted in 1917, with its clear reservation of authority to municipalities to enact ordinances regulating the sale of milk which is, or, as it now reads, may be, detrimental to public health. General Statutes, § 2491, as amended by Public Acts of 1929, Chapter 272. If an intent on the part of the legislature to assume the exclusive function of regulating the sale of milk is to be found, it must be in the provisions of Chapter 225 of the Public Acts of 1925. Only if in that Chapter can be found expressed a change in the attitude of the legislature toward milk regulation can the majority opinion be justified, and the provisions of the earlier laws are not important.

The Act of 1925 contains a number of detailed provisions concerning the production and handling of milk, but that in itself would not be sufficient to exclude local regulation; witness the Tenement House Act, with its express provision that local ordinances not inconsistent with it should not be affected. General Statutes, § 2596. The law of 1925 was in fact the enactment into statute of the pre-existing regulations of the milk regulation board. Its sufficient explanation lies in a doubt as to the right of the legislature to delegate to any board the making of such regulations. It was introduced into the legislature by the chairman of the Committee on Agriculture and never went before the Committee on Cities and Boroughs, as would have been rather to be expected if it were intended to result in a sweeping curtailment of the power of municipalities to regulate the sale of milk under specific charter provisions. Nor is it likely that merely by enacting these provisions into a statute in lieu of the regulations of the board, the legislature intended to do away with the reservation of the power of local authorities to enact ordinances, under which the regulations

had come into being. If the matter went no further I could not believe that the legislature intended by that Act so great an inroad into the powers of municipalities, many of which have received charter authority to regulate the production and sale of milk.

However, if there be doubt as to the intent evinced by the enactment of the 1925 Act, it is resolved by other legislation. In at least one instance, the very legislature which passed that Act gave to a municipality charter power "to license milk dealers and regulate the sale and manner of distribution of milk and to prohibit the sale thereof unless in accordance with such regulations." Special Laws of 1925, p. 914. Such a grant is hardly consonant with a purpose on the part of the legislature to preëmpt the field of milk regulation. But of much more significance are the provisions of Chapter 272 of the Public Acts of 1929. The first section of this Act, as already noted, amends that provision of the law establishing the milk regulation board which preserves the power of municipalities to enact ordinances for the control, regulation, sale or distribution of milk which might be detrimental to public health. The second section provides that in any town, city or borough where there is no local system of milk and cream control provided by charter, the local health officer or board of health may present to an electors' meeting proposed rules and regulations "concerning the inspection of dairies and the production, care, handling, marketing or sale of milk or cream, the protection of the public from the use of milk or cream which may be detrimental to the public health and the granting of licenses to milk dealers"; and that upon approval of these regulations by the town, city or borough they are to be submitted to the state department of health and upon its approval they become effective regulations in the municipality. The

first clause in this section is the clearest recognition by the legislature of the existence of a local power to make regulations as to milk where there is specific charter authority. Moreover, it cannot be that the legislature intended to provide for the adoption of local regulations of this nature in towns, cities or boroughs where there is no specific charter authority for the control of the production and sale of milk, and to deny the power to enact such ordinances to municipal corporations which have such authority. Obviously the Act of 1929 was intended to make provision for the control of the production and sale of milk in municipalities where no charter gave a power of regulation, and to leave other municipalities to the exercise of their charter powers, thus establishing a statewide system of local control. This statute alone is sufficient to show that the legislature has had no intent to assume the exclusive function of milk regulation.

In this opinion HAINES, J., concurred.